The next matter is Amboy Bank Corporation v. Bank Advisory Group. Mr. Kearney. Good morning. I am Dennis Kearney. I'm the attorney for Amboy Bank Corporation and with Your Honor's permission I'd like to hang on to three minutes. Thank you very much for this opportunity and thank you to my colleagues Mr. Deutsch and Mr. Seidman. Obviously what brings us here today is an appeal based on a random summary judgment made by the District Court in favor of Jenkins-Hilcrest and the Bank Advisory Group on really what amounts to a loan theory. That is whether a misleading proxy statement gave rise any damages on behalf of Amboy. The funny thing about this case is the District Court considered this motion three times. Amboy Bank won on the first motion. Amboy Bank won on the motion for reconsideration and then two years later without any changes in the fact, any changes in the law, any changes in anything else, the District Court did a 180 and decided that partial summary judgment should be granted and then a year later determined that full summary judgment. Now the Casey Court held that you were under an independent obligation to compensate your shareholders at a fair value, correct? Incorrect. What the Casey Court said. Let's look at page 568 of Casey. How does it say something different then? I'm sorry, page 568 of the Casey Court. I've got the appellate division, the official, I'm sorry I don't have that, Your Honor. But if you take a look and this, on the motion for reconsideration, this is the very point we made to the District Court. The District Court stopped reading at page 107. The ticket in for the non-statutory dissenters, that is everybody other than Hermanos, the ticket in was as follows from what the Jersey Court said. The dissemination of an inaccurate or misleading proxy statement in conjunction with a cash out merger that sets forth an opportunity for non-statutory dissenters to make a claim. That's the point that the District Court missed because essentially what the District Court did when it stopped reading the sentence in front of that, it turned the entire statutory scheme on its head. And I think if you take a look at the very. I thought it was a little different. I thought the court was saying there is an independent duty to compensate at a fair value. And that my question was going to be, in that case, how did the misleading proxy statement cause the injury? I thought what you would then argue was, okay, look, we were going to stop at 81. And that's it. We were just going to stop there. We wouldn't have done the deal. Correct. The record is absolutely clear that the Board of Directors considered doing a deal at $81, rejected the deal with Jenkins standing in the room and Bagg on the outside. They go out the door at $73 per share. What does Jenkins and Bagg tell the shareholders in the proxy statement? Anybody who's a non-statutory dissenter, i.e., if you're getting cash under the Jersey statute, you have no other rights. So the ticket in for them, as the Casey court said, was you've got to find some breach of the fiduciary obligation. You've got to find something that went wrong. And what went wrong here was that the information we gave all of our folks to get their vote, because remember, I'm asking you to vote to take away your shares. As Jenkins said in this particular case, we have to give the shareholders all material information necessary to make an informed decision. It is undisputed in this case that the proxy statement was bad. The proxy statement was misleading. And if you take a look at what Judge Boyle did. But did you argue in the state court that you would have undertaken the subchapter S conversion absent the Jenkins and the Bagg's negligent advice? No, that was not an issue in the trial court in any of the three trials below. The issue in the trial court was what was the number and whether there was a breach of fiduciary duty. And in fact, what the trial court said was, there was really no breach by the bank. Remember, the board of directors was a defendant in that case. And what the trial court said was, I'm not going to hold anybody on the board of directors liable, because as Judge Boyle put it at the trial court level, it is clear that they brought in the best experts that they thought were out there and relied on them. And if there were mistakes here, it was made by these folks. So there was not an issue of we would have stopped, because at that point, the deal is done. I thought one of your claims, though, in this case is that had you received the proper advice from Jenkins, you would have considered other options. What other options could you have considered? Well, as the expert pointed out, one option is doing nothing. Other options that the chairman had testified about, they looked at reverse Dutch auctions, they looked at buying other institutions, because the problem that Amboy had back in 1996-97 is essentially what the banks are being criticized today is having a lot of cash, sitting on it, not doing anything with it. So the decision was made on advice from these folks. But it was a great decision. It turned out to be a great decision. Did it turn out to be a great decision? As it turned out, no. And that was sort of the motion we filed, because one of the things that I don't want to get lost here is the day after the merger, the day after the subchapter S conversion, everybody in the bank looked the same. It went from a sub-C to a sub-S. Everything remained the same. The bank's performance increase was irrespective of the tax event. All the subchapter S's, it determines how you pay taxes at year end. That's all the sub-S. You avoid double taxation, so you have a single tax. It's great for the shareholders that remain. Right. The money has to be blown out to the shareholders. Assuming you have a profit. Right. Assuming you have a profit. Now, what has happened since then, obviously today, and I'm assuming I can say this even though the court hasn't ruled on my motion, today, the bank is under operating under a supervisory agreement, which has nothing to do with Jenkins, nothing to do with BAG, nor did the profits the bank made for a couple of years have anything to do with them. All that is is a label. This was not a situation where Wells Fargo acquired Wachovia. You've got all those synergies. You get rid of a back office. You get rid of a general counsel. This was not that. All this was was when the Clinton administration gave the banks the opportunity to go sub-S. One of the reasons was to help the little guys, like a $2 billion bank, stay independent. This was a mechanism, purely a tax one. So the fact that the bank did well then and the fact that the bank is under the watchful eye of the Feds today is neither here nor there. So I don't want to get distracted on that, but I think the way this court ought to go about what I think is a pretty simple analysis. But the point is you wouldn't have made the sub-S conversion if it wasn't beneficial, if you didn't perceive it was beneficial at the outset, correct? Correct. The benefits not only being financial benefits. One of the critical issues testified below was this bank wanted to stay independent. Testimony at the trial level in the state of New Jersey, 19, the early 90s and 96, we went from 126 banks to the time of this merger down to 70 banks. All the banks were disappearing in that go-go market. When the decision was made or reportedly made that the cap price would be $81 per share, how did that decision made? Well, what happened was the bank advisor group came in and they said cash for market value, obviously we all agree that was the wrong standard. They came into the board and said $69.50, that's our number. They walked out of the room, the board said as much as you gentlemen are, and they say we want to go a little bit higher, we want to get passed to be fair. Harold Smith, lawyer at Wilentz Goldman, says let's pay everybody 81, that's where that number comes from, Your Honor. The board debated the 81 number and said too rich, we can't afford it. They settled at the 73 by essentially adding $3.50 to the bag number. And the important point to remember in the financial analysis is, and that gets into the, you know, the woulda, coulda argument. The problem with the woulda, coulda, we shoulda paid whatever number is that it turns out to be illegal under federal law. There are restrictions in federal law, which we cite in the brief, which talk about how much dividends the bank can blow out at any given time. And in this particular case, the bank has had to set aside $54 million. 750,000 shares at $73 per share, we have $54 million. The problem was under our federal ratios, we would be blowing out more dividends than were allowed. So essentially, not essentially, in fact, we had to go to the controller of the currency and get a waiver. The controller of the currency said, I'll give you a waiver, you can pay out $8 million more than you would otherwise be allowed to under the federal standards. The point of all that being that there was a federal limit built into what we could do. It's not just what the board said, so that when you get to what the district court said, I think the law in Jersey is you have to pay whatever some court decides to pay. Really doesn't fit what I think, what the Third Circuit wants to be saying about the controller of the currency watching these banks. And I think the second easiest way to analyze this, if you look at the estoppel argument, what we said to the district court on the motion for reconsideration is, just tell me anything you want about estoppel, mention it. Because what the appellate division said was, but for the misleading proxy statement, anybody who read the proxy statement, voted no and took the money, you're out. What the appellate division said was, no, you've got a bad proxy statement, everybody is in. So we said to the district court on the motion for reconsideration, you've got to say something about the estoppel argument, because but for that, these folks that read it, voted no and took the money would be gone. Why isn't your claim limited to the 200, I think it was 207,000 shares? There were 207,000 shares. In that category. The 207,000 shares, I don't even think we need to talk about it. I think you're absolutely right, your honor. That's totally in the mix. It's the other 400,000 shares is where the judge went wrong on the statutory scheme. Because if you allow this decision to stand, what you have is a federal district court telling the state of New Jersey that the dissenter's rights statute is meaningless. The distinctions that the Jersey legislature has drawn within that statute, which says if you are a statutory dissenter, you get these rights. And if you are getting cash, you have no rights other than what the standard fiduciary duties are. So I think for that reason, it's important not to lose sight of the estoppel argument, but it's even more important to go back to the way the district court turned the Jersey scheme on its head. Thank you, Mr. Carney. Mr. Seidman. Good morning, your honors. Good morning. Mitchell Seidman for the Bank Advisory Group, the Appalachian Cross Appellant. Your honors, as it relates to the proximate cause and damages issues and the August 13, 2008 decision of the district court, I'm going to be leaving that to my colleague, Mr. Deutsch. It was their motion below each time. What I'm going to focus on, and we do adopt their position, and that's what we did in our brief, what I want to focus on is our cross appeal, which is extremely important to my client because we believe that, although we believe the district court's decision, the August 13, 2008 decision should be affirmed, should this court reverse it, my client should nonetheless remain dismissed out of the case for the grounds that are set forth in our cross appeal. I want to start by reading paragraph two of the bankruptcy court's February 28, 2007 order, which is at the appendix, page 761. Paragraph number two reads, the automatic stay of 11 U.S.C. 362A is hereby modified to allow the presiding judge in civil action number 02-5410 DMC, currently pending in the United States District Court for the District of New Jersey, to end the, quote, lawsuit, close quote, to determine whether complete relief can be granted to Amboy and Jenkins and Gilchrist if the Banker's Advisory Group Inc. is either severed or dismissed from the lawsuit, period. The bankruptcy court did not lift the automatic stay. The bankruptcy court did not vacate the automatic stay. The bankruptcy court did not set aside the automatic stay. The bankruptcy court modified the automatic stay for the very limited purpose of allowing the district judge to determine whether complete relief could be afforded. In effect, whether you were an indispensable party. Excuse me? In effect, whether you were an indispensable party. No, whether he's a necessary party under Rule 19A. Not an indispensable party. There's a significant difference that we've briefed in our papers. In light of the New Jersey comparative fault limitation on joint and several liability, why wouldn't you be a necessary party? Because this is no different than any other case where there are joint tort feasors and an absent joint tort feasor from a case does not prevent a court from awarding complete relief to the existing parties in the case. The case law before and after the New Jersey statute hold that. The American Home case that we cited at page 3 of our reply brief holds that. It's been tort law for many, many years that an absent joint tort feasor does not prevent a court from awarding complete relief. And in fact, even if it was an indispensable party issue, we argue that the American Home decision stands for the proposition that an absent joint tort feasor is not an indispensable party. Okay? A joint tort... What's Bank Advisory Group's status now? Bank Advisory Group is liquidated. Chapter 7 case is finished. The trustee was ordered in this same order not to defend this case should the district court find that complete relief could not be awarded and therefore not sever or dismiss Bank Advisory Group out of the case. The Bank Advisory Group still is... I guess exists as a shell of an entity, you know, because a corporation in a Chapter 7 does not get a discharge. But the Bank Advisory Group, Inc., you know, exists as a shell of an entity, and that's it. So who's paying you today? Well, Your Honor, that's a good question. Post-petition, my fees have sort of been stop and go, touch and start, whatever the former principal can do or we work out to do, candidly. It's not the way it was when this case started back in 2002. And in fact, and that's in the record on this appeal, what's gone on here, in my view, is almost punitive to my client. I mean, my client filed a Chapter 7 bankruptcy. The plaintiff, Amboy, had its rights and remedies to participate and did participate in that bankruptcy, made a motion to dismiss the bankruptcy. The motion was dismissed. The automatic stay was modified for a very limited purpose. We come back to the district court. The district judge, in my view, goes off on an analysis which was not provided for by the modification of the automatic stay. In my view, the district judge went off on an indispensability analysis, made a determination that he believed Bank Advisory Group was important to the issue of liability, I think was his words, much more a 19B analysis. And to some extent, doesn't that come back to Judge Wanasky's first question? If there is a possibility that you could be more than 40% responsible for the injuries here, then aren't you a necessary party? But you can still afford completely relief to both Amboy and Jenkins. Our liability, even if it is more than 40%, is something that's to be pursued in the Chapter 7 process. There's a claim to be processed there. Okay, but I'm just saying, but aren't you still a necessary party under Rule 19? I do not believe so. Because? Because joint tort feasors are not indispensable parties. But if you're more than 40% responsible under the New Jersey Statute 2A, what is it, 15.5.3A-C, I mean, it's different in New Jersey than a lot of other states, but if a jury found that you were more than 40% responsible for the injuries, wouldn't it be able to recover fully from Jenkins? But the problem with that is we don't know that until the end of the case. And so if you extrapolate that logic, why wouldn't that apply in any joint tort feasor case? So is what you're saying that the 362 lifting of the stay was only for the purpose of determining whether you were a necessary party? Correct. Only whether we were a 19A necessary party, whether complete relief could be afforded to the parties. If you do the analysis and take into consideration the 40% issue, you don't know that until the end of the case, which means we'd be doing this analysis in every joint tort feasor case under New Jersey state law. But let's say you were 50% liable if this ultimately went to trial. You had to be a necessary party, right? Why is it different than any other case where there are multiple joint tort feasors in the case? Because the statute provides that. You mentioned those other cases, but I didn't see any of those cases talking about this distinction or addressing the particular argument that's presented here. I think the American Home case that we cited and discussed on page 3 of our reply brief, because we addressed it after they raised it in their opposing brief. It's not in our initial brief. That's the case where there are two insurance companies and the issue is whether they're going to share liability. I think that does cover it. That's my reading of it. In addition, also related to the cross-appeal, is we believe that the district court abused its discretion in determining not to hear our summary judgment motion later on in the case. Now, part of the summary judgment that we made was rendered moot when Mr. Carney and I came to an agreement that the August 13, 2008 decision should be adopted and made applicable to the bank advisory group. However, there is a third component to our summary judgment motion, which is unrelated to that, which we believe, if there's a remand here, we should be permitted to have heard on summary judgment, and that is the fact that the plaintiff never obtained an expert witness to opine on liability of the bank advisory group. And without an expert witness, we don't see how they're going to proceed to trial against us. There is not a bank appraiser expert in this case. And you're welcome to ask that to Mr. Carney on rebuttal. I'm sure he'll answer that that's correct. I also know he's going to answer that he believes the two lawyers who he's gotten expert opinions from that have opined on alleged malpractice of Jenkins, he believes that that covers the bank advisory group also. We disagree with that completely. There's no discussion in those reports of how you value bank stocks and what standards were in place at a particular time. And we believe we should be entitled to heard on summary judgment on that motion. Anything further? Thank you, Mr. Sessions. Good. Mr. Deutsch? Good morning. Good morning. Still morning. May it please the court. My name is Edward Deutsch and I represent Jenkins and Gilchrist. What is the status of Jenkins and Gilchrist today? They're defunct as a law firm. So BAG is defunct. Jenkins is defunct. Yes. The I think that I'm fighting a cold, so pardon me. I know the feeling. Mr. Deutsch, just raise this up a little bit. I think that our briefs cover everything that was discussed this morning by Mr. Carney. I believe that I won't belabor that, but I would just add that the one thing Amboy cannot seem to get straight here is that it cannot get away from cramming an unfair price down the throats of squeezed out minority shareholders no matter how accurate, complete, or thorough the disclosures are in a proxy statement. There are two, they confuse the rights to all shareholders, as stated in Casey, pointed out by Judge Ambrose, is an independent right to receive fair value. Yeah, but there's also pretty clear evidence they would have not gone beyond $81 per share. I think that's in the underlying discovery it's clear that the appraiser, Mr. from BAG, told the board that the high end of this was $100, so $110. They still went ahead with the deal, and if they didn't want to go ahead with the deal, the proof of that... Well, they went ahead thinking that it was, you know, somewhere between $69.50 and $73, but it was below $81, and one court then says $90, and then the next court says $100, and that ends up $114. What evidence do you have that they would have gone through with the deal, even if they had known at the outset it was $114? Two things. One is they knew the high end was going to be $100 or more if no discounts were allowed. The second one is that the deal was done in December. The payment wasn't made until January to shareholders, and on that day, they filed suit. If they were worried and they knew to a certainty, in the deposition testimony of at least two of the directors, they knew to a certainty they were going to be sued over price. If they were worried about the price being too high, they could have simply joined in the injunction, had a hearing on what a fair price was, and then went ahead with this deal. But they were hell-bent on going ahead with this deal because they were worried. They knew it was such a good deal for them. They were worried that the law might change, and they didn't want to take that chance at any price. And clearly, even at $114... But who was giving them the advice that the discounts, the marketability discount, the minority interest discount would be in play here with respect to their shares? I mean, this is basically the way you do estate planning for closely-held corporations. And you try to get a number down as low as you can in order to have things done that allow you the lowest amount to be valued for the corporation for estate planning purposes. But for purposes of actually doing a cash-out merger, what makes you think that... It wasn't Amboy that came up with that. It was your client and BAG, right? Our client never opined as to values. Our client only prepared the proxy statement. The valuation expert gave the value. But this was also something that Jenkins and Gokas did a lot of in those days. They did. They did a great deal. I mean, this was a cash cow for a while. They did a great deal of it, and they were expert in it. And they... If they're expert in it, what would make them think that these kind of minority and marketability discounts would be in play with regard to a cash-out merger? Because they looked at it at the time and found that it was a gray area of the law in the state of New Jersey, and they advised that there was no prohibition against it, but it could very well be that they would be disallowed, and it would be a significantly higher fair value price. And the bank elected to go ahead with full knowledge of that, and it turned out to be the deal of the Western world for them. These people... The majority that stayed in after squeezing out the minority, which from a bully pulpit, because they had less than a third of the stock, I believe, in one year went from about a dollar twelve or something in dividend to eleven dollars. In two years or three years, they became the second most profitable bank in America on return of average assets, on return of average equity. If the misrepresentations in the proxy statement are irrelevant, why did the court in Casey have to address the estoppel and acquiescence defenses? Because that's the other confusion that Amboy had. Amboy confuses the fact that there's a... the statutory right of a dissenting shareholder. They think this is the only way somebody can dissent. They don't understand or are unwilling to understand that the absolute right, the independent right of all shareholders to get fair value is based not on the statute, but it's based on the fact that the majority has the bully pulpit over the minority. And if the majority doesn't deal well with the minority, the minority has a chance to come back and get a valuation. There'd be no need to consider the estoppel or acquiescence defense, then, under your reading of the law. Under my reading of the law, any time there's estoppel or acquiescence it has to be an extraordinary circumstance. Extraordinary. And I think in a circumstance like this, where the majority shareholders stay in the deal, they get everybody else out, they stay in the deal, they make tens of millions of dollars personally, they become one of the most successful banks in America, and until they get in bed with Solomon Dweck in the later years, and that's what put them in this federal issue, among some other very bad choices they made ten years later. Why that's even brought up here today is beyond me, but basically, for the next seven or eight years, they were wildly profitable, they made tens of millions of dollars, and to allow any type of acquiescence or estoppel to a minority shareholder in that circumstance, I don't think you can have special circumstances for that. You might have it in a situation where it was a very close call majority-minority and people were part of the process, people were on the board, they voted for it, they benefited from it, and now they can't come back and say something. But that's completely different from the equities of this Any other questions? Mr. Deutsch, thank you very much. Thank you, sir. Mr. Carney. Thank you. I just want to make one quick last point. We can't lose sight of the fact that the deal closes on December 5th. There are three different lawsuits filed against the bank, all of which are challenging the deal, challenging the proxy statement, challenging the price. Who defends Amboy Bank at the order to show cause to shut this deal down? Jenkins does. Jenkins is sitting next to Amboy Bank. The litigation hits. We now know what the issues are. Jenkins says to Amboy, fight it, they have no rights. And what Jenkins says to Amboy is, the reason you should fight it, remember we haven't blown one nickel out yet. Jenkins says, we're going to tell you what to write on the checks. Full and final payment in satisfaction of your claims, or words of that effect that copies in the record. Jenkins says to Amboy. But the point is, at that point, I mean, what the Casey Court says, look, there's a misleading proxy statement. And that's why they went through with the deal. So it doesn't make a whole lot of difference what you said on the check. There was a misleading proxy statement. And you're saying, if there was a misleading proxy statement, it wasn't our fault. We were misled by these folks. There is no question that is 100 percent correct. Just an absolutely dumb question. If they're both defunct, you're not going to get anything out of them, are you? That's why God gave me insurance and reinsurance. Okay. This is not just some intellectual exercise. There is a $25 million policy and I think a $25 million excess policy. Believe me, I'm sure you guys got better things to do than I do than to talk about something that doesn't matter. What about the statement of lifting of the stay under 362 was a very limited action by the court. My problem, maybe I'm too simple a guy. Down in the Texas bankruptcy court the judge lifted the stay, send it up here, have the district court determine do we need them around, and the district court said, yes we do and under Texas law they've got to continue an operation for events such as this for a number of years. So it's all legitimate. And as your at this point, limited under the language read by Mr. Seidman to making a determination as to whether their BAG is a necessary party. And if so then don't you have to go back for a further lifting of the stay under section 362? I did not understand what the bankruptcy court said to require us to go back. I think that that was exactly what you want to grab the language and just read it one more time? Do you have it? I don't. I think he has it right there. What does it say? The automatic stay is hereby lifted to allow the lawsuit to proceed. What else does it say? In all respects with Bankers Advisory Group as a party. That was the way I read it. Can you pass it up? Just pass it up to me if you would. Thank you. You're welcome. And as I said maybe I read it too simply but that's the way I took it and I think that's the way Jenkins took it and I think that's the way the district court took it to proceed as a party. These are from Judge Kavanaugh. Where is the order of the bankruptcy court here? It was the first one and I think it was paragraph two. The automatic stay of 362A is hereby modified to allow the presiding judge in that civil action, which is the district court action, currently pending the United States District Court in the District of New Jersey to determine whether complete relief can be granted to Amboy and Jenkins and Gilchrist if Bankers Advisory Group, Inc. is either severed or dismissed from the lawsuit. In the event the district judge determines that full relief cannot be accorded to the remaining parties without BAG remaining a party the automatic stay is hereby lifted to allow the lawsuit to proceed. Yeah, that does support you. Yeah, that was my reading of that. But anyway if I could just finish my thought real quick on the payment piece of it. The point is at that point in time once the lawsuits have hit Jenkins is advising Amboy these other folks cannot collect if they cash these checks and of course when they get out of the case a year later the reason they get out is they say well maybe they can collect if our proxy statement is bad which is exactly how it turned out.  remember that after the deal was done Jenkins sat next to us saying fight, fight, fight, all the other arguments really go out the window. Thank you Mr. Carney. The case was very well argued by all sides. We'll take the matter under advisement.